COLUMBIA TRUST COMPANY, as Trustee, Respondent, v. WALTER EIKELBERGER and JANE DOE EIKELBERGER, His Wife, Appellants.

[245 Pac. 78.]

CAREY ACT CONTRACTS — POWERS OF STATE BOARD OF LAND COMMISSIONERS—AMENDMENT OF CONTRACT—RIGHTS OF SETTLERS—STORAGE WATER — EVIDENCE — FINDINGS — CONDITIONS PREREQUISITE TO FORECLOSURE OF CAREY ACT LIEN.

1. Where two contracts are entered into between the same parties or their successors in interest, in regard to the same subject matter but at different times, the second contract being supplementary of the first, and the first contract is modified by certain provisions of the supplementary contract, the two agreements must be construed together, and the first contract will be enforced according to its terms in so far as it is not modified by the supplementary contract.

2. *Held,* that under the supplementary contract between the investment company and the settlers in this case the investment company contracted to deliver to the purchaser of a water right during the irrigation season such part of the storage water available as added to the water available from the natural flow would give the purchaser two acre-feet per acre, and that it was not a contract to deliver merely the purchaser's proportionate share of storage water and his proportionate share of natural flow.

Points Decided.

3. *Held*, that that part of the finding of the lower court wherein it was found that one and one-fourth acre-feet of water per acre during the irrigation season is reasonably sufficient to reclaim the land involved in this action and to raise a profitable crop thereon is against the preponderance of the evidence.

4. *Held*, that the delivery of one and one-fourth acre-feet per acre during what it is conceded were average years is not a compliance with the contracts in controversy in this case.

5. While the state board of land commissioners has wide discretionary powers in the initiation of a Carey Act project as regards the amount of water to be supplied to settlers, as soon as the company has entered into contracts with settlers for the delivery of a certain quantity of water it no longer has the power to substantially change the contract in that respect to the detriment of a settler, without his consent.

6. *Held*, that the second state contract, wherein it was attempted to provide that the settler shall be entitled to receive a proportionate interest in the water available up to a maximum of two acre-feet per acre, was not as respects such provision within the terms of the settler's consent to an amendment of the first state contract, as such consent was expressed in the provisions of the supplementary contract between the investment company and the settler, and to that extent is ineffectual.

7. No right to the foreclosure of a Carey Act lien for the full amount of the contract price accrues until there is made permanently available to the settler an ample supply of water adequate for the proper and sufficient irrigation of his land or at least the amount specified in the contract.

8. *Held*, that the record in this case fails to show that plaintiff company has performed the conditions precedent to its right to bring this action, and that neither under the contracts in controversy nor under the statutes can such action be maintained.

APPEAL from the District Court of the Sixth Judicial District, for Butte County. Hon. Ralph W. Adair, Judge.

Action to foreclose lien of a Carey Act water contract. Judgment for plaintiff. *Reversed and remanded.*

Publisher's Note.

1. See 6 R. C. L. 850.

See Contracts, 13 C. J., sec. 487, p. 529, n. 52; sec. 615, p. 596, n. 63; p. 597, n. 71.

Waters, 40 Cyc., p. 835, n. 44.

G. F. Hansbrough, for Appellant.

Water contracts do not make deferred payments a lien upon the water rights and land until the water has been made permanently available for the reclamation of the land. (*Childs v. Neitzel*, 26 Ida. 116, 141 Pac. 77; *Adams v. Twin Falls Oakley L. & W. Co.*, 29 Ida. 357, 371, 161 Pac. 322; *Idaho Irr. Co. v. Pew*, 26 Ida. 272, 274, 141 Pac. 1099.)

The existence of the lien of a Carey Act construction lien depends primarily upon the completion of the construction works and the delivery of water through the works by the construction company, as stipulated in its contracts with both the state and entryman. (*Adams v. Twin Falls Oakley Land & Water Co., supra.*)

The theory of proportionate share in the water in the system should in no case be adopted where it is shown that there is not sufficient water to irrigate all of the land in the project, or to furnish the amount of water sold. (*State v. Twin Falls Salmon River etc. Water Co.*, 30 Ida. 41, 53, 166 Pac. 220, 224.)

Where two written contracts are entered into between the same parties, concerning the same subject matter, whether made simultaneously or on different days, they may, under some circumstances, be regarded as one contract and be construed and interpreted together. (6 R. C. L., sec. 240, p. 851; *Chicago Trust Bank v. Chicago Title Trust Co.*, 190 Ill. 404, 83 Am. St. 138, 60 N. E. 586; *Blagen v. Thompson,* 23 Or. 239, 31 Pac. 647, 18 L. R. A. 315.)

Any modification of a state contract between the state and a construction company which authorizes the construction company to require payment of a settler before the water sold is delivered, or any contract of the construction company which requires payment before such delivery, and which does not fully protect the settler, under the Carey Act as accepted by the laws of this state, is illegal and void. (C. S., secs. 2996, 5636; *Gerber v. Nampa & Meridian Irr. Dist.*, 16 Ida. 1, 100 Pac. 80; *Green v. Byers,* 16 Ida. 178, 101 Pac. 79.)

Peterson & Coffin and William Story, Jr., for Respondent.

In the contract between the company and the state the right is reserved by the state to amend the contract with the consent of the company "for the purpose of carrying out the objects of the contract and for the purpose of meeting any conditions then unforeseen," and the company is also given the right to make such changes in the irrigation system in respect to the number, capacity and location of the canals, reservoirs, etc., as it may decide, subject only to the approval of the State Land Board. Under our statutes the board is vested with very wide discretionary powers. (*Furbee v. Alexander,* 31 Ida. 738, 176 Pac. 97.)

The covenant of the company to construct the reservoir and the covenant of appellant's predecessor in interest to pay the purchase price of the right were not concurrent, but, on the contrary were wholly independent of each other, in the sense in which those terms are used in the construction of contracts. (Page on Contracts, secs. 2971–2974; *Fresno Canal & Irr. Co. v. Perrin,* 170 Cal. 411, 149 Pac. 805; *Central Appalachian Co. v. Buchanan,* 73 Fed. 1006, 20 C. C. A. 33; *Anderson v. Coolin,* 28 Ida. 494, 155 Pac. 677; *Goldsborough v. Orr,* 21 U. S. 217, 5 L. ed. 600; *Benham v. Columbia Canal Co.,* 74 Wash. 110, 132 Pac. 884.)

BUDGE, J.—This is an action by respondent Columbia Trust Company to foreclose the lien of a water contract and supplementary agreement, for the balance alleged to be due from appellant upon the purchase price of the water right. The cause was tried to the court without a jury and judgment rendered in favor of respondent, from which judgment this appeal is taken.

The facts involved, about which there is no serious conflict, are in brief as follows:

In 1910 the state of Idaho secured the segregation under the Carey Act of certain public land of the United States in what is now Butte county. In June, 1910, Blaine County Irrigation Company, Ltd., entered into a contract with the state whereby the company agreed to construct an irrigation

system for the reclamation of the land within the segregation. Under the terms of such contract the company was authorized to sell to the settlers making entry upon the lands water rights or shares in the irrigation system to be constructed, for the unpaid part of the purchase price of which water rights the irrigation company was accorded a prior lien upon the water rights sold, and also upon all the right, title and interest of the purchaser in the land to which the water should become appurtenant. The contract also provided for the organization of a corporation to be known as Blaine County Canal Company, Ltd., in which title to the water rights and the ownership, control and operation of the irrigation system should ultimately become vested. The water rights sold were to be represented by shares of stock in this company issued to the entryman on the basis of one share for each acre of land susceptible of irrigation. On September 1, 1910, appellant's predecessor, having made application to enter 160 acres of land in the segregation, entered into a "water contract" with the irrigation company for the purchase of 160 shares of stock of the canal company at the price of $40 per share, $640 being paid at the time, and the balance of $5,760 to be paid in instalments maturing over a period of ten years with interest on deferred payments at six per cent per annum.

During the years 1910 and 1911 the irrigation company partially completed an irrigation system for the reclamation of the land within the segregation and partially constructed the storage reservoir provided for in the state contract. The completion of this reservoir was abandoned as it was found that it would not hold water. The irrigation company was therefore not in a position to establish a completion of its irrigation system as required by the terms of its contracts with the state and with the settlers, and it was also unable to furnish the entrymen with the quantity of water called for in their respective contracts. A controversy then arose between the settlers and the irrigation company as to the proper interpretation of the irrigation company's con-

tracts both with the state and with the purchasers of water rights in respect to the quantity of water which the settlers were entitled to receive, the settlers taking the stand that the company was required to deliver a constant flow during the irrigation season of one eightieth of a second-foot per acre. The company was unable to furnish a constant flow of that amount, but claimed that it performed the contract by the delivery of a proportionate share of whatever water was available. In these circumstances the irrigation company concluded that it was unable to enforce payments on the water contracts with the settlers and found itself unable to meet its obligations. Foreclosure proceedings were had and the interest of the irrigation company passed to Blaine County Investment Company, the present owner of the project. Under the terms of a trust deed which is not in the record, all water contracts are held by the respondent Columbia Trust Company as security for the payment of indebtedness to it, consent to which trust deed is contained in the settler's contracts.

On or about July 1, 1916, the investment company with the consent of the state board of land commissioners entered into a supplementary contract with the settlers wherein among other things it agreed to furnish additional water by the construction of a reservoir on Dry Creek, the state relieving the investment company and its predecessor from completing the reservoir specified in the first contract. By the terms of this supplemental contract the investment company was to construct the Dry Creek reservoir with reasonable diligence and complete the same by July 1, 1917, and the settlers were to receive during the irrigation season two acre-feet of water, measured at their headgates, for each acre of land, and their proportionate shares of the natural flow for fall irrigation. The provisions of this contract with respect to the quantity of water will be hereafter discussed.

It is conceded that at the time of the trial of this action the Dry Creek reservoir was not completed as provided in the supplementary contract with the state and settlers.

It also appears without controversy that while certain additional water, made available by the construction of the reservoir in part, has been distributed to the settlers, including appellant, in no year has the appellant received two acre-feet of water per acre as called for in the supplementary contract. It is further admitted that the original payment of $640 made by appellant's predecessor and a further principal payment of $320 made December 31, 1918, and certain interest payments aggregating $499.20 are the only payments made upon the purchase price of the water right, appellant refusing to make further payments on the ground that the water has not been delivered. On account of such delinquencies in the first contract respondent elected to declare the entire amount due and payable and brought the present action to foreclose its Carey Act lien on the land and water right and interest in the irrigation system owned by appellant, except that, as stated by respondent, it does not seek to foreclose appellant's interest in the reservoir and appurtenant works since, admittedly, the investment company had not at the time of the trial completed the Dry Creek reservoir or furnished appellant two acre-feet of water per acre in each irrigation season.

Numerous errors are assigned and relied upon by appellant for a reversal of the judgment. The main points urged seem to be: (1) that there is no evidence to show that the respondent, or its predecessors in interest, have constructed the canals or irrigation works described in the contracts with the state and with the settlers; (2) That there is no evidence to show that respondent or its predecessors in interest have ever delivered to appellant the quantity of water contracted to be delivered; (3) that there is no evidence to show that the irrigation works of respondent or its predecessors have been completed to the extent that it could deliver to appellant the water contracted to be delivered; (4) there is no evidence to show that the amount of water delivered is sufficient to properly irrigate appellant's land.

As before remarked, it is conceded that the Dry Creek reservoir has not been completed, and that appellant, in common with other settlers, has received during each irrigation season a quantity of water approximately only one and one-fourth acre-feet per acre. While the capacity of the canal system seems to be adequate for the carriage of two acre-feet per acre delivered under a rotation plan at the rate specified in the supplementary contract with the settler, it does not appear from the record but that the continued failure of the investment company to deliver that quantity of water as required by the contract is due to the unfinished state of the reservoir, though it is stated that the final issue of certain suits to determine priorities to the use of the waters of Little Lost River and tributaries may have some bearing on the matter.

The trial court found that:

"The Blaine County Irrigation Company, Ltd., and its predecessors (successors) in interest . . . . have delivered to the said Holland and her successor in interest (appellant) their proportionate share of the water which has been available for use under the water rights appurtenant to said irrigation system, amounting approximately to one and one-fourth acre-feet of water per acre during the irrigation season, and being reasonably sufficient to reclaim the land and enable the defendant (appellant) to raise a profitable crop thereon, but not the maximum crop which the land would produce if supplied with two acre-feet of water which the defendant Eikelberger (appellant) will be entitled to receive under the contract dated July 1, 1916, when the reservoir shall have been completed; and the court further finds that the maximum amount of water which can beneficially be used on the lands without waste is two acre-feet per acre. . . . . "

[3] We are of the opinion that that part of the finding wherein the court finds that one and one-fourth acre-feet per acre during the irrigation season is reasonably sufficient to reclaim the land and to raise a profitable crop is against the preponderance of the evidence. The evidence points

42 Idaho—7

out that considerable farming land lies idle under existing conditions of water supply; that short season crops only may be grown with a reasonable expectation of full yield, and that the contract quantity of two acre-feet per acre during the irrigation season, with fall watering, is required in order to constitute an ample supply of water adequate to the proper and sufficient irrigation of the land of appellant and others in the same situation.

The contract of September 1, 1910, between appellant's predecessor and the irrigation company, herein called the first contract, contained the following provisions, which we have numbered for convenient reference.

(1) "That the company has heretofore entered into a contract with the state of Idaho, acting by its State Board of Land Commissioners, whereby the company bound itself to construct a system of canals, a reservoir and irrigation works for the reclamation and irrigation of certain lands. . . . ."

(2) "This agreement is made in accordance with the provisions of said contract between the state of Idaho and the company, which, together with the laws of the state of Idaho under which this agreement is made shall be regarded as defining the rights of the respective parties, and regulates the provisions of the shares of stock of the Blaine County Canal Company, Limited." ·

After reciting the instalments of principal and the dates on which they were payable, it is provided:

(3) "Interest from May 1, 1911, at six per cent per annum, may be charged if water is available from said irrigation system, for use during the irrigation season of 1911, and if not available for said season such interest shall commence on May 1st, 1912, if water is available for use during the irrigation season of 1912. But it is further understood and agreed that no payment other than the initial payment, and no interest shall be required to be paid under this contract until the water is available for distribution from said system at a point within one-half mile, by ditch line, of each legal subdivision of one hundred sixty acres for

which shares have been sold; and until such time as said system is accepted by the state of Idaho.''

(4) '' . . . . Each share entitles the owner thereof to receive one eightieth of one cubic foot of water per second of time for the irrigation of and domestic uses on'' the land described in the contract.

[1] We are of the opinion that the first contract, and the contract of June, 1916, called the supplementary contract, are to be construed together, the first contract being modified by the provisions of the supplementary contract, and where not so modified, enforced according to its terms. (6 R. C. L. 851, sec. 240; *Chicago Trust Bank v. Chicago Title Trust Co.,* 190 Ill. 404, 83 Am. St. 138, 60 N. E. 586; *Blagen v. Thompson,* 23 Or. 239, 31 Pac. 647.)

The respondent contends that the appellant's predecessor by the execution of the supplementary contract between herself and the investment company agreed to accept only a proportionate share of such water as is available; has definitely agreed that the instalments of principal and interest due upon the water contract shall in any event be due and payable on the date fixed in the supplementary contract without regard to the completion of the Dry Creek reservoir, or the furnishing of two acre-feet per acre through the irrigation season, and that the completion of the Dry Creek reservoir is not a condition precedent to the liability of the settler for the payment of principal and interest upon the water contract. Its contention further is that the investment company has provided a permanent supply of irrigation water sufficient to grow profitable agricultural crops.

At the time of execution of this supplementary contract the reservoir contemplated by the first contract had been long abandoned. The natural flow of the streams in the Little Lost River Valley is inadequate for the irrigation of the segregation unless supplemented by storage water. There was a dispute between the investment company and the settlers as to whether or not the contract called for a continuous flow of one-eightieth of a second-foot per acre dur-

ing the season. The company could not establish a completion of the contract with the state or with the settler, and so could not collect from the settlers. Under those conditions the supplementary contract expressed the reason for its execution, and its purpose and scope, in the following language:

"Whereas, a question has arisen as to the proper interpretation of the said state and Carey water contracts in respect to the total amount of water the purchaser is entitled to receive under such contracts during each irrigation season, in consequence whereof the purchaser has failed to make certain of the principal and interest payments as required of him by such Carey water contract, and

"Whereas, it is the desire of the parties to settle and adjust such question of interpretation and the amount now due and owing from the purchaser to the investment company under the Carey water contract aforesaid, as well as to settle and adjust forever all other matters and disputes between them growing out of or in any way connected with either or both of the contracts aforesaid."

[2] The first question is: Did the supplementary contract provide that the settler should be entitled to receive only his proportionate share of the water available up to a maximum of two acre-feet per acre during the irrigation season? We find the following provision on that point:

"Third. The purchaser agrees to buy from the investment company and the investment company agrees to sell and to issue forthwith to the purchaser, his heirs and assigns, 160 shares of the capital stock of the Blaine County Reservoir Company, a corporation to be formed by the investment company under the laws of Idaho at its sole expense, and to which the investment company shall convey said (Dry Creek) reservoir, the existing pipe line and canal extending from Dry Creek to Wet Creek, and Idaho water permits Nos. 6753, 8195 and 10010, in exchange for the capital stock thereof, each of which shares shall represent (a) an equal and undivided fractional interest in the said reservoir, pipe line and canal, based on the number of shares therein

which may be sold by the investment company, and (b) such part of the water which may be available under the permits aforesaid and such other permits as the investment company or its successor-in-interest, may hereafter acquire for use upon the lands of the purchaser above described, as added to the water which may be available to the purchaser under his said Carey water contract, will supply him with two acre feet of water for each acre of his lands aforesaid, measured at the purchaser's headgate, between the first days of May and September of each year. It is understood and agreed, however, that the water which the purchaser is entitled to receive under the said Carey water contract and this contract may be taken by him as desired for the irrigation of his crops, under a reasonable system of rotation among all users of water from said reservoir, at a rate not exceeding two cubic feet per second for each forty acre tract irrigated, and that two acre feet of water per acre shall be the maximum amount of water which the purchaser shall be entitled to receive under both his said Carey water contract and this contract between May 1st and September 1st of any one calendar year, provided, that nothing herein contained shall limit in any manner the purchaser's right to receive and use his proportionate share of such water of Little Lost River as may be available under the water rights appurtenant to said Carey Act project during the fall season of each year, and, provided further, that in no event shall the investment company have the right to sell a greater number of such shares than can be satisfied in full, in average years, by the water available under said permits and such rights as it may hereafter acquire to use the water of Dry Creek.''

We are of the opinion that the foregoing provision modifies provision No. 4 of the first contract in respect to the quantity of water which the settler is to receive during the irrigation season. We construe the amended provision to mean that the investment company contracts to deliver to the purchaser during the irrigation season such part of the storage water available as added to the water available

from the natural flow shall give the purchaser two acre-feet per acre. It is not a contract to deliver to the purchaser his proportionate share of storage water and his proportionate share of natural flow. That this provision is intended to guarantee to the purchaser two acre-feet of water, and not merely a proportionate interest is also evidenced by the proviso that the number of shares to be sold shall be so adjusted to the water available as to provide two acre-feet per acre in the average year. **[4]** The delivery of one and one-fourth acre-feet per acre during what are conceded to be average years is not a compliance with the contracts.

While the first contract states that it is made in accordance with the contract of the irrigation company with the state, in which latter contract a right of amendment is reserved, that right is but one to amend the contract so as to carry out its objects, i. e., to secure to the settler that which he contracted for,—an ample supply of water adequate to the proper and sufficient irrigation of his land. In *State v. Twin Falls Salmon River Land & Water Co.*, 30 Ida. 41–53, 166 Pac. 220, 224, it was said that this reservation was made "in order that subsequent conditions which may arise might be properly dealt with and in order that the intending settler might have notice that such a power was reserved to the state and the construction company, subject, of course, to the vested rights of the settlers."

**[5]** While the state board of land commissioners had wide discretionary powers in the initiation of the project in the matter of the amount of water to be supplied to the settler, once the company has entered into contracts with the settlers for the delivery of a certain quantity of water it no longer has the power to substantially change the contract in that respect to the detriment of the settler, without his consent, provided that the quantity of water contracted for is not in excess of that which may be beneficially used. We have previously expressed our view that the preponderance of the evidence shows that two acre-feet of water per acre during the irrigation season, with fall watering, does not exceed the quantity that may be beneficially applied to the land.

[6] We have said that the supplementary contract was entered into with the consent of the state board of land commissioners, but it appears that what is called the second state contract was executed between the state and the investment company on August 24, 1917, the company no doubt desiring to secure a new agreement with the settlers before applying to the board for an amendment · of the first state contract. Under this second state contract the company was relieved from the construction of the reservoir planned under the first contract in consideration of its agreement to construct the reservoir on Dry Creek, and as the first state and settlers' contracts provided for the construction of an adequate reservoir, the appellant's predecessor should be entitled to shares in the new reservoir company without consideration other than the $40 she had first agreed to pay. It is noted that the second state contract provided that:

"The covenants and provisions in respect to the quantity of water purchasers of rights in the system, whether represented by shares of stock of the Blaine County Canal Company, Ltd., or otherwise, and the manner of delivery thereof, shall be, and the same are hereby abrogated and held for naught, and in lieu thereof, it is hereby agreed that the quantity of water which the purchaser of shares of stock of said Blaine County Canal Company, Ltd., and Blaine County Reservoir Company are entitled to receive shall be (a) between the first day of May and September, in any one year, a proportionate interest based on the number of shares finally sold of such water as may be available for use upon the lands irrigated from said irrigation system, under the water rights now owned and hereafter acquired by Blaine County Canal Company, Ltd., and Blaine County Reservoir Company, which shall be in all two acre-feet for each acre of land to which such shares of stock are appurtenant, measured at the point provided in the contract of June 29, 1910 · · · · "

If this amendment may be said to provide that the settler shall be entitled to receive a proportionate interest or share in the water available up to a maximum of two acre-feet per acre, this is not within the terms of his consent to an

amendment, and for the reasons before given, is ineffectual so far as it goes beyond the provisions of the supplementary agreement between the investment company and the settler.

The next contention by respondent is that the supplementary contract with the settler provides that the instalments of principal and interest due on the Carey water contract shall in any event be definitely due and payable on the dates fixed without regard to the completion of the Dry Creek reservoir or the furnishing of two acre-feet of water per acre. It is true that such supplementary contract states that it is intended to settle the amount due and owing from the settler to the investment company and all other matters arising in connection with the first contract, but the actual provisions of this compromise must govern over any general recitals. The question of what amount was due and owing to the company was one arising out of the question of whether or not the company had delivered the water contracted to be sold, and whether or not the irrigation system had been completed. The new contract settled the controversy over the quantity of water and in practice recognized as correct the contention of the settler that up to that time at any rate the investment company had not so far complied with its first contract that it could require payment of interest or instalments of principal on the purchase price of the water rights. Under the rule of law before stated, the provisions of the first contract, where not modified by the supplementary contract, control the rights of the parties. There is no express cancelation of that part of the first contract providing that "no payment other than the initial payment, and no interest shall be required to be paid under this contract until the water is available for distribution from said system at a point within one-half mile, by ditch line, of each legal subdivision of one hundred sixty acres for which shares have been sold; and until such time as said system is accepted by the state of Idaho."

It seems to us that this is a clause of such importance to the settler and to the company that if it were intended that it be abrogated, express provision would have been made to that effect. We are unable to find an implied

abrogation in the preliminary recitals as under the circumstances a restatement of the payments due amounts to no more than a recognition of the fact that the investment company had not completed its system in accordance with the state and settler's contracts, and that the situation of the entryman required an extension of the time of payment of the instalments in the event that the company fully completed the reservoir system within the time fixed in the contract.

The first contract with the settler provides that upon the purchaser's default "the company may declare the entire amount of the principal purchase price for said water rights due and payable, and may proceed either in law or equity to collect the same, and to enforce any lien which it may have upon the water rights hereby contracted, or upon the land to which the water rights are dedicated . . . . " Since the settler's contract does not itself create the lien, the right thereto, mentioned in the first state contract, must be found in the statutes. The federal statute authorizes the state to create a lien against the land. Under the state law (C. S., sec. 3019) a lien is created against both the land and the water right, but it is not stated therein when such lien attaches, and our attention has not been called to any provision of the first state contract in that connection. In *Childs v. Neitzel,* 26 Ida. 116–140, 141 Pac. 77, on rehearing, it was said that the liens of water contracts do not attach until the water has been made permanently available to the land. That statement of the law was amplified in *Idaho Irr. Co. v. Pew,* 26 Ida. 272, 141 Pac. 1099, where it is held that

"If . . . . a company that is seeking to foreclose a lien has not made water permanently available to the land in question, and available in sufficient quantities and seasons to comply with the provisions of the contract, such defense will always be open to the settler."

[7] No right to foreclosure accrues until there is made permanently available an ample supply of water adequate for the proper and sufficient irrigation of the land. In our opinion the record presents no showing that the company

has performed the conditions precedent to its right to bring this action for the foreclosure of the contract price.

So far as appellant's predecessor was concerned, the investment company's agreement to construct a new reservoir on Dry Creek was not a gratuitous undertaking. It was part of the consideration for her agreement to pay $40 per share for the water right that she have an interest, through the canal company, in an adequate reservoir. She was not chargeable with the company's engineering mistakes. The parties who originally contracted with the irrigation company to pay less than $40 per share for water rights were required, as we understand it, to pay the difference between the stipulated price and $40 in order to secure any part of the storage water. These persons the respondent would call purchasers of shares in the reservoir system, and admits that as to them the fact that the reservoir was not completed and that the company had not furnished two acre-feet per acre during the irrigation season would prevent it from foreclosing upon the reservoir stock for the purchase price of such stock. At the same time it asserts here that there is now due and payable the entire amount of the first contract, part of which sum was agreed to be paid in consideration of the construction of an irrigation system including an adequate reservoir. We believe respondent's position in this respect is hardly consistent.

[8] For the reasons that a permanent supply of water, either in the quantity specified in the contracts, or in a quantity ample and adequate to the proper and sufficient irrigation of appellant's land, has not been furnished, we hold that neither under its contracts nor under the statutes can the respondent maintain this action for the full amount thereof.

The judgment of the trial court is reversed and the cause remanded, with instructions to dismiss the action. Costs are awarded to appellant.

William A. Lee, C. J., and Wm. E. Lee, Givens and Taylor, JJ., concur.

(April 5, 1926.)

ON PETITION FOR REHEARING.

BUDGE, J.—A petition for rehearing has been filed by respondent which we have carefully considered, together with the brief in support thereof and appellant's reply thereto, as well as the brief of *amici curiae.*

This action was not brought or tried upon the theory that respondent was entitled to recover the stipulated purchase price for the quantity of water actually made available or delivered to appellant and to foreclose its Carey Act lien for the quantity of water so delivered or made available and used by appellant, but, on the contrary, respondent took the position that it was entitled to foreclose for the full amount of the purchase price of water contracted for, irrespective of the quantity of water delivered or made available. Respondent conceding that the amount of water contracted for was not available and had not been delivered, and it further appearing that the amount of water so delivered or made available was not sufficient for the successful irrigation of appellant's land, there could be no recovery for the full amount contracted for, in the absence of the delivery of the amount of water specified in the contract or of an amount sufficient and reasonably necessary for the successful irrigation of appellant's land in accordance with the usages of good husbandry.

As was said in the case of *Twin Falls-Oakley Land & Water Co. v. Martens,* 271 Fed. 428, at page 434:

"But, as the appellant company failed to deliver a quantity of water sufficient to comply with its contract and to enable the defendant to reclaim his land, it cannot rely upon the contract as ground of foreclosure for the full amount of deferred payments."

The question whether or not respondent was entitled to have the purchase price proportionately reduced and entitled to have its lien foreclosed for a proportionate amount was not here for determination and was not decided. In passing

upon that question in the original opinion the following language was used:

"No right to the foreclosure of a Carey Act lien for the full amount of the contract price accrues until there is made permanently available to the settler an ample supply of water adequate for the proper and sufficient irrigation of his land, or at least the amount specified in the contract.

"For the reasons that a permanent supply of water, either in the quantity specified in the contracts, or in a quantity ample and adequate to the proper and sufficient irrigation of appellant's land, has not been furnished, we hold that neither under its contracts nor under the statutes can the respondent maintain this action *for the full amount thereof.*"

The petition for rehearing is denied and the cause is remanded, with directions to the trial court to permit the pleadings to be amended.

William A. Lee, C. J., and Wm. E. Lee, Givens and Taylor, JJ., concur.